# EXHIBIT 2

1

1   Rough draft -- Michael Shamos

2

3

4           THE VIDEOGRAPHER:  Good morning.

5   We are going on the record at 10:03 a.m.

6   on April 12th, 2022.  This is media unit

7   1 of the videorecorded deposition of

8   Michael Shamos being taken in the matter

9   of Aqua Connect Inc. et al. versus

10  TeamViewer U.S. Incorporated filed in the

11  United States District Court for the

12  District of Delaware, Case No.

13  18-01572-MN.  My name is Matt MacMurchy

14  from the firm Veritext, and I'm the

15  videographer.  The court reporter is Lane

16  Butler from the firm Veritext.  I'm not

17  authorized to administer an oath I'm not

18  related to any party in this action nor

19  am I financially interested in the

20  outcome.

21          Counsel will now please state

22  their appearances and affiliations for

```
18    hardware rather than computer software.
19       Q.   Okay.  Can you give me the most
20    recent case that you declined to work on
21    because you didn't have the right
22    expertise?
23       A.   I'd have to go back and look
```

                                           7

```
 1    through my files on that.
 2       Q.   You can't tell me as you sit
 3    here today?
 4       A.   No.
 5       Q.   Have you ever had your opinion
 6    excluded by a judge?
 7       A.   Yes.
 8       Q.   When?
 9       A.   Case No. 31 on my CV the FedEx
10    ground case.
11       Q.   And if I remember correctly, you
12    told me the last time I deposed you that
13    you actually agreed with the Judge's
14    decision to exclude your opinion in that
15    case.  Is that right?
16       A.   Yes I did agree with it then and
```

17    I still agree with it.

18        Q.   Has your opinion been excluded

19    in any other cases?

20        A.   I think that there have been

21    some motions to strike that were

22    successful.  There were no successful

23    Daubert's other than in the FedEx ground

                            8

1     case.

2         Q.   When were you retained to work

3     on this case?

4         A.   It was in the summer of 2020.

5         Q.   You were disclosed to us in June

6     of 2020.  Does that sound about the same

7     time that you were retained?

8         A.   Yes.  Because I think the first

9     month in which I billed any time was July

10    2020.

11        Q.   Thank you to that.  Can you give

12    me an estimate of the total number of

13    hours you worked on this case?

14        A.   Approximately 180.

15        Q.   180?

16    A.   Yes.

17    Q.   And how many hours did you of

18    the 180 hours, how many did you devote to

19    writing your three reports in this case?

20    A.   Oh, it was would have been the

21    vast majority of that. I would say that

22    at least 150. Well, 140 anyway.

23    Q.   Did you have any role in writing

9

1    the preliminary infringement contentions

2    in this case?

3    A.   I forget when the preliminary

4    infringement contentions were served.

5    I've had a role in preparing contentions

6    since I became involved in the case.

7    Q.   So the preliminary contentions

8    by my notes were given to us in 2019.

9    Not a trick question. I think you

10    probably didn't have any role in the

11    preliminary contentions is that right?

12    A.   Then that's right.

13    Q.   Okay. So you had a role in

14    preparing the final infringement

15    contentions in this case?

16    A.    Yes.

17    Q.    What was your role in preparing

18    the final infringement contentions in

19    this case?

20    A.    It consisted of reviewing and

21    editing the draft final contentions.

22    Q.    And how much editing did you do?

23    A.    Not a lot.

                                              10

1     Q.    Your hourly rate stated in your

2     report is $600 an hour.  Correct?

3     A.    Yes.

4     Q.    That's your customary rate?

5     A.    Yes.

6     Q.    Now, when I deposed you a couple

7     of months ago you told me that your

8     customary hourly rate was $575.  Why are

9     they different?

10    A.    Sometimes when I go through an

11    expert witness agency, I reduce the rate

12    so that the blended rates to the client

13    is affordable.

14      Q.   If I took $600 an hour and
15   multiplied it by 180 hours would that be
16   the amount that you've charged Aqua
17   Connect in this case up until today?
18      A.   Almost.  It would include
19   everything charged through the end of
20   March.  Although the time includes time
21   spent in April that has not been billed
22   yet.
23      Q.   That would be a good estimate?

                                        11


1       A.   Yes.
2       Q.   Are you familiar with the mobile
3    embedded and wireless security group at
4    Carnegie Mellon?
5       A.   I didn't hear the last few words
6    of the question.
7       Q.   Are you familiar with the mobile
8    embedded and wireless security group at
9    Carnegie Mellon?
10      A.   No.
11      Q.   Now, I said I'd given you the
12   three reports as exhibits in the case.

```
13   Exhibit 1 your first report, is that a

14   complete statement of the work that led

15   to your conclusion that TeamViewer

16   infringes the asserted patents?

17        A.   So I don't completely understand

18   the question.  It's a summary of the --

19   of the opinions that I'm prepared to

20   offer at trial and the bases for them.

21   But it I don't think the report is

22   intended to be a complete summary of all

23   the word that I did.

                                          12




 1        Q.   I didn't ask about the work you

 2   did I asked about a complete summary of

 3   your statements that you intended to make

 4   at trial?

 5        A.   I don't actually think that was

 6   the question I thought I heard the word

 7   work in the question.

 8        Q.   Is Exhibit 1 a complete summary

 9   of the conclusions you intend to offer at

10   trial on the issue of whether TeamViewer

11   infringes the asserted patents?
```

11     patents are invalid?

12         A.   I'm not sure that they're

13     complete.  I think that my obligation is

14     to disclose opinions to be expressed at

15     trial.  And it has those.

16         Q.   Did you leave any opinions on

17     the issue of validity out of report II on

18     purpose?

19              MR. HATCH:  Objection vague.

20         A.   Not that I can think of.

21         Q.   Exhibits C, D, and E to your

22     second report were C and D were something

23     that you refer to as the -- oft cited

                                        14


1      work of someone named Mr. Levenez.  Are

2      you familiar with that?

3          A.   Yes.

4               MR. HATCH:  Paul Paul are these

5      in the exhibits?

6               MR. STEADMAN:  They're not.  I'm

7      not going to ask him about the details of

8      them at the moment.  I told him if he

9      needed them I would put them up but

10   they're not currently in the exhibits.

11       Q.   For exhibits C and D, the work

12   that you say is oft cited by Mr. Levenez.

13   When did you first become aware of that

14   work by Mr. Levenez?

15       A.   So I'm not sure.  I didn't have

16   a memory of it at the time that I looked

17   him up.  But then when I when I saw them,

18   they seemed vaguely familiar to me.  So I

19   think I've heard of them before but I

20   don't have a specific recollection of it.

21       Q.   So you think you -- you think

22   you'd heard of them before report II but

23   you have no specific recollection.  Is

                           15


1    that right?

2        A.   That's right.

3        Q.   So when you say -- when your

4    report says that they are oft cited, who

5    are they oft cited by?

6        A.   Oh so I went and looked up

7    references to Levenez and I saw many

8    places in which they were sited.

9   Q.   Can you give me some examples?

10  A.   No but we can just go to Google

11  search and find.

12  Q.   Are they cited in academic

13  papers?

14  A.   They're cited on -- they're

15  cited on websites.  I'm not sure that

16  they're in academic papers because they

17  would be primarily papers on the history

18  of computing rather than on technical

19  subjects but they're all over the place.

20  Q.   Is Mr. Levenez' work cited in

21  work on technical subjects to your

22  knowledge?

23  A.   I don't know.

                                    16


1   Q.   Do you know Mr. Levenez?

2   A.   No.

3   Q.   Is he a real person?

4   A.   I assume so.  But since I don't

5   know him, I can't swear to that.

6   Q.   Where -- where does he work?

7   A.   I don't know.

```
 8      Q.   What does he do for a living?
 9      A.   I don't know.
10      Q.   Has anyone checked his work in
11   exhibits C and D?
12      A.   Yes.  I think Dr. Goldberg did
13   and he had no dispute about them.
14      Q.   Anyone else?
15      A.   Not to my knowledge.  I assume
16   plenty of people, but I don't know any of
17   them.
18      Q.   Now I want to ask about exhibit
19   E which is an Apple Exhibit E to your
20   second report which is an Apple developer
21   document.
22      A.   Yes.
23      Q.   When did you first become aware
```

                                17


```
 1   of the Apple development developer
 2   document attached as Exhibit E to your
 3   second report?
 4      A.   Yeah hang on a second.  So you
 5   can put it in the exhibit share or I can
 6   access it on my own computer.  It's
```

```
 7    your -- it's your choice.
 8        Q.   I'm not super good with this
 9    but.  So we'll call this Exhibit 2 E and
10    if you refresh your screen you should
11    have it now.
12    (Exhibit 2E was marked for identification
13    and is attached.)
14        A.   Yes.  It's there.
15        Q.   Is it fair to call this an Apple
16    developer document?
17        A.   Yes.
18        Q.   And when did you first become
19    aware of Exhibit E to your second report?
20        A.   So I think it was relatively
21    early in the case.  So it would have been
22    in 2020 to my recollection.
23        Q.   And what is an Apple developer
                                             18


 1    document?
 2        A.   It's a technical document that
 3    is published by Apple to assist
 4    developers who are developing
 5    applications on Apple platforms.
```

6    Q.   And is that a well known type of
7    document to people in your field?
8    A.   Yes.
9    Q.   And you were aware of it in 2020
10   when you were working on this case before
11   your first report was created.  Correct?
12   A.   Yes.
13   Q.   Were you the person that found
14   the Apple developer document, Exhibit E
15   to your second report, or was it someone
16   else?
17   A.   I think it was me.
18   Q.   And did you let counsel know
19   about it at that time?
20   A.   I don't think I did so on the
21   day I discovered it.
22   Q.   Did you let him know about it
23   during the period of discovery before you

19

1    started working on your reports?
2    A.   You mean the period of fact
3    discovery?
4    Q.   Yes.

```
5      A.   I don't recall when I informed
6   counsel about its existence.
7      Q.   You have no recollection of that
8   whatsoever?
9      A.   No.
10     Q.   Was it before you wrote your
11  first report?
12     A.   I think it was.
13     Q.   I'd like to talk about your work
14  at Carnegie Mellon a little bit.  And I'd
15  like to talk about it in relation to your
16  definition of a person of skill in the
17  art.  You define a person of skill in the
18  art in paragraph 67 of your first report
19  for reference.
20     A.   Okay hang on a second.  Sorry
21  which paragraph was that?
22     Q.   67.
23     A.   Yes.
                                            20



1      Q.   You yourself are a person of
2   skill in the art under this definition.
3   Correct?
```

```
4      A.   At least, yes.
5      Q.   And you certainly have worked
6   with many such people in your time at
7   Carnegie Mellon?
8      A.   Yes.
9      Q.   You've taught them?
10     A.   Well I've taught people who
11  became those of skill in the art.
12     Q.   So you're a person that's
13  teaching those who are becoming a person
14  of skill in the art?
15     A.   Yes.
16     Q.   And is it fair to say you've
17  known hundreds of people that have become
18  people of skill in the art over your time
19  at Carnegie Mellon?
20     A.   Yes.
21     Q.   And so you would be intimately
22  familiar with the knowledge and skills of
23  a person of ordinary skill in the art in
```

                                    21


```
1   this case.  Fair?
2      A.   Well, so I'm hesitating on the
```

10   to say that the claim is not infringed
11   then it's not going to go in my report.
12   I'm just I'm not going to say that it's
13   not infringed I just won't say that it is
14   infringed.
15        Q.   When was the last time that you
16   raised with counsel the idea that one of
17   the asserted claims was not infringed
18   when you were working for the party
19   asserting the patent?
20        A.   Oh within the last two years.
21        Q.   How many times has that happened
22   in your career?
23        A.   Oh, that's not that uncommon.

                                            115


1   Because initially, for example, it's very
2   common to begin with an allegation that
3   all of the every claim of the patent is
4   infringed.  And then as one tries to put
5   together arguments, one finds that it's
6   not always possible to do it and so the
7   list of claims gets narrowed.
8        Q.   Are you relying on Exhibit 2 C

```
 9    the Levenez document for anything in your

10    infringement analysis?

11        A.   So I'm in my infringement

12    analysis of course I say that the accused

13    systems have Mach-derived versions and

14    it's the Mach-derived versions that are

15    accused.  Now, how do I come to the

16    opinion that they're Mach-derived?  One,

17    Apple says they are.  Two, Levenez says

18    they are.  Three, there are other

19    documents on the Internet that have

20    timelines that are scaled down versions

21    of the Levenez timeline.  It's just well

22    known around the world Apple touts the

23    fact that its operating systems are
```

                                          116

```
 1    Mach-derived.

 2        Q.   What other documents what other

 3    timelines are you referring to?

 4        A.   Oh, well, there are other --

 5        Q.   Does it say anywhere in your

 6    report?

 7        A.   No.
```

```
 8      Q.   Why didn't you cite the Levenez

 9   document in your opening report?

10      A.   Because I thought that it was a

11   simple proposition that macOS and iOS are

12   Mach-derived.  It was only when I got

13   blow back on that that I raised the

14   Levenez evidence.

15      Q.   So if I look at the exhibit C

16   the Levenez document, which of these

17   many, many, many operating systems are

18   Mach-derived?

19      A.   Okay let's take a look.  Hang on

20   a second.  I got to go back to it then.

21   Exhibit C.  I'm looking for -- okay.  So

22   if you see -- oh my there's a -- there's

23   a lot to follow here.  I'm looking for
```

                                                              117

```
 1   example in the 1985 page which is page

 2   106.  In the middle of the page there's

 3   Mach 1985.  And then Mach 1985 points to

 4   the right points to Mach 2.0.  Then we

 5   have to follow that line from Mach 2.0 to

 6   the next page where it points to Mach 2.5
```