IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AQUA CONNECT, INC. and STRATEGIC TECHNOLOGY PARTNERS, LLC,

        Plaintiffs,

        v.

TEAMVIEWER US, INC. and TEAMVIEWER GERMANY GMBH,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No.  18-1572-MN
Consolidated

## **MEMORANDUM OPINION**

Stamatios Stamoulis, STAMOULIS & WEINBLATT LLC, Wilmington, DE; Ryan E. Hatch, HATCH LAW, PC, Los Angeles, CA; Lawrence M. Hadley, Stephen Underwood, GLASER WEIL LLP, Los Angeles, CA – attorneys for Plaintiffs

Brian A. Biggs, Angela C. Whitesell, Erin E. Larson, DLA PIPER LLP (US), Wilmington, DE; Michael Jay, DLA PIPER LLP (US), Los Angeles, CA; Paul Steadman, Benjamin Mueller, DLA PIPER LLP (US), Chicago, IL; William L. Bartow, DLA PIPER LLP (US), Philadelphia, PA; Gianni Minutoli, DLA PIPER LLP (US), Reston, VA – attorneys for Defendants

September 29, 2023
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

The Court presided over a five-day jury trial from August 8, 2022 to August 12, 2022. (*See* D.I. 255 ¶ 2; *see also* D.I. 281, 283, 285, 286 & 288 ("Tr.")).  At the end, the jury found that Defendants TeamViewer US, Inc. and TeamViewer Germany GmbH (together, "Defendants" or "TeamViewer") directly and indirectly infringed two patents owned by Plaintiffs Aqua Connect, Inc. and Strategic Technology Partners, LLC ("Plaintiffs" or "Aqua Connect").  Presently before the Court are Defendants' renewed motion for judgment as a matter of law or, in the alternative, for a new trial (D.I. 278) and Plaintiffs' motion to amend the judgment to include pre- and post-judgment interest (D.I. 276).  For the reasons set forth below, the Court will GRANT-IN-PART and DENY-IN-PART Defendants' motion for judgment as a matter of law or for a new trial and will DENY Plaintiffs' motion for pre- and post-judgment interest without prejudice to renew.

## I.    BACKGROUND

Defendants provide software that allows a user to remotely access a macOS or iOS device situated in a different location than the user.  Plaintiffs own U.S. Patent No. RE46,386 ("the '386 Patent") and U.S. Patent No. 8,924,502 ("the '502 Patent"), which generally relate to user sessions running on Mach-derived computer systems.[1]  On October 11, 2018, Plaintiffs filed this action, asserting that TeamViewer US, LLC infringes claims of the '386 Patent and the '502 Patent.  Then, on June 28, 2019, Plaintiffs filed an action in the Central District of California against TeamViewer GmbH, also asserting infringement of the '386 and '502 Patents.  The California action was transferred to this District on December 16, 2019 and consolidated with this action on January 3, 2020.  (D.I. 105).  About a year later, the parties substituted the current Defendants

---

[1]    Although a fiercely contested issue in this case, "Mach" generally refers to a type of operating system kernel.

TeamViewer US, Inc. and TeamViewer Germany GmbH for the previously sued entities. (*See* D.I. 154 & 155; *see also* D.I. 156 & 157).

From August 8, 2022 to August 12, 2022, the Court presided over a five-day jury trial. (*See* D.I. 255 ¶ 2; *see also* D.I. 281, 283, 285, 286 & 288). The jury found that both macOS[2] and iOS versions of Defendants' product directly infringe claims 25 and 27 of the '502 Patent and claims 25 and 27 of the '386 Patent. (D.I. 269 at 2). The jury also found Defendants liable for induced and contributory infringement of those claims. (*Id.* at 3-4). The jury further found that Defendants had failed to prove that any claim was invalid as anticipated or obvious. (*Id.* at 5). Plaintiffs were awarded $5,700,000 in damages in the form of a lump-sum payment. (*Id.* at 6).

On August 22, 2022, the Court entered judgment on the jury verdict under Rule 58(b) of the Federal Rules of Civil Procedure. (*See* D.I. 274). On September 19, 2022, Plaintiffs moved to amend the judgment to include pre- and post-judgment interest. (*See* D.I. 276 & 277). Also on September 19, 2022, Defendants renewed their motion for judgment as a matter of law and included an alternative request for a new trial in that motion. (*See* D.I. 278 & 279). Briefing on post-trial motions was completed on October 18, 2022. (*See* D.I. 290, 291, 292 & 293).

## I.   LEGAL STANDARDS

### A.   Judgment as a Matter of Law

Judgment as a matter of law may be entered against a non-moving party if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." FED. R. CIV. P. 50(a)(1). Judgment as a matter of law is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find

---

[2]      The trial transcript refers to "Mac OS," which is the same thing as "macOS."

liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  Entry of judgment as a matter of law is a remedy to be invoked only "sparingly." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004).

Following a jury trial, a renewed motion for judgment as a matter of law under Rule 50(b) may be granted only if the movant demonstrates "that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alteration in original) (internal quotation marks omitted).  Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support the finding under review.  *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018).  In determining whether substantial evidence supports the jury verdict, the Court may not make credibility determinations, weigh the evidence or substitute its own conclusions for that of the jury where the record evidence supports multiple inferences. *See Lightning Lube*, 4 F.3d at 1166.  Moreover, in the Third Circuit, when the movant bears the burden of proof on an issue, judgment as a matter of law is appropriate only if "there is insufficient evidence for permitting any different finding." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976) (quoting 9 WIGMORE ON EVIDENCE § 2495 at 306 (3d ed. 1940)); *see also Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019).

**B.      Motion for a New Trial**

"A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED. R. CIV. P. 59(a). Common reasons for granting a new trial are:  (1) the jury's verdict is against the clear weight of

the evidence and a new trial is necessary to prevent a miscarriage of justice; (2) there exists newly discovered evidence that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the Court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

Whether to grant a new trial is a question committed to the Court's discretion. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Unlike the standard for judgment as a matter of law, the Court need not view the evidence in the light most favorable to the verdict winner when ruling on a motion for a new trial. *See Ateliers*, 85 F. Supp. 3d at 775. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

## II.   <u>DISCUSSION</u>

### A.   **Defendants' Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial**

Defendants' motion for judgment as a matter of law or, in the alternative, for a new trial, advances a litany of issues that purportedly require the Court to undo all findings of liability found by the jury. In particular, Defendants argue that they are entitled to judgment of no liability because the verdict is based on evidence not in the record and because the jury was improperly allowed to construe claims in connection with reaching an infringement and invalidity verdict. Defendants further argue that judgment as a matter of law should be entered in their favor on the '386 Patent because it is an invalid broadening reissue patent and that the claims of both asserted patents are indefinite. Defendants also argue that there is insufficient evidence to support the jury's

verdict of direct and indirect infringement and no anticipation or obviousness, as well as $5.7 million in lump-sum damages. And for every issue raised, Defendants request a new trial in the alternative. The Court addresses these issues largely in turn.

### 1.   Plaintiffs' Evidentiary Support for Infringement

Defendants first argue that the jury verdict must be overturned because demonstratives of Plaintiffs' infringement expert, Dr. Shamos, "improperly showcased documents and testimony never offered, much less entered into evidence." (D.I. 279 at 4). Specifically, Defendants complain that nine demonstrative slides Dr. Shamos used while testifying on direct (PDX3.44, PDX3.45, PDX3.62, PDX3.64, PDX3.65, PDX3.66, PDX3.67, PDX3.69, PDX3.70 ("the now objected-to slides"))[3] contained materials that were either never admitted or actually excluded by the Court. (*Id.* at 6; *see also id.*, Appendix A (Defendants' annotated version of the slides at issue)). According to Defendants, without these slides and evidence displayed thereon, there is no basis to support a finding that Defendants' products meet certain elements of the asserted claims of the '502 and '386 Patents. (D.I. 279 at 7). The fundamental problem with Defendants' argument is that, with one exception, Defendants ***never objected to these slides*** at trial. Defendants' arguments to the contrary are simply not credible.[4]

---

[3]      There are no objections in Defendants' post-trial briefing that any other unadmitted or excluded evidence was used to support any part of the jury verdict.

[4]      In their reply brief, Defendants insist that they did object at trial, citing their own post-trial opening brief as evidence of that objection. (*See* D.I. 292 at 1 (citing D.I. 279 at 4)). Setting aside the assumption that Defendants would have cited the trial transcript had the proper objections been made, that page of the opening brief cites the pretrial conference (which did not address any slides) and Defendants' at-trial objection to the use of an interrogatory response on one demonstrative. (D.I. 279 at 4 (citing D.I. 246 (pretrial conference) and Tr. at 241 (objecting to P[T]X341 interrogatory response being displayed))). Similarly, tangential mention of four of the now objected-to slides in Defendants' pre-verdict motion (D.I. 266 at 9-10) does not take the place of an objection to the demonstratives being shown to the jury as it happens (or is about to happen).

This Court requires parties to raise objections to anticipated exhibits, demonstratives and trial testimony the morning before that evidence will be offered.  (*See* D.I. 241 ¶ 24 (pretrial order setting forth exhibit objection procedure) & ¶ 35 (pretrial order setting forth demonstrative objection procedure); D.I. 246 at 52:8-15 & 53:21-54:1 (at the pretrial conference, the Court explaining the objection process for exhibits and demonstratives and cautioning that waiver will result from failure to raise in the morning); D.I. 255 (order adopting pretrial order as modified at the pretrial conference); D.I. 263 (amended final pretrial order)).  On the morning that Dr. Shamos was called, Defendants presented the Court with numerous objections to exhibits and demonstratives to be used with Dr. Shamos but almost none of the now objected-to slides were included.  Specifically, before that trial day began, Defendants objected to thirteen exhibits and eight demonstratives.[5]  PDX3.67 is the only now objected-to slide that was also the subject of a timely objection according to the Court's procedures.  (*See* Tr. at 2:14-24:9).  Moreover, Defendants did not object when the now objected-to slides were displayed to the jury as Dr. Shamos was testifying.  (*See* Tr. at 237:3-247:16 (Dr. Shamos testifying from claim element 25(1), which appeared on PDX3.39, through claim element 25(8), which appeared on PDX3.70, with Defendants only objecting to display of an interrogatory response as evidence)).  In other words, Defendants failed on ***two separate occasions*** to object to all but one of the now objected-to slides.  Thus, Defendants' current objections to all but PDX3.67 were waived and cannot be the basis for any post-trial relief.[6]

---

[5]   Defendants stated that they objected to the eight demonstratives for the same reasons they had objected to trial exhibits PTX506, PTX508, PTX617, PTX618, PTX652, PTX650, PTX375, PTX397 and PTX648.

[6]   Defendants' failure to object at trial also casts doubt on the credibility of their arguments that the information on these slides was so damaging that the verdict must be overturned.

As to the only demonstrative slide that was the subject of any objections at trial – PDX3.67 – the Court reaches a similar result.  In their post-trial briefing, Defendants complain that PDX3.67 displayed evidence not admitted (PTX619) and evidence excluded (PTX618).  In ruling on the various objections the morning before Dr. Shamos testified, the Court sustained Defendants' objection as to PTX618, finding that the exhibit would not come into evidence through Dr. Shamos but allowing him to testify he relied on it and to discuss it.  (Tr. at 5:7-6:23).  The parties discussed how this ruling applied to demonstrative slide PDX3.67, agreeing that "the citation to that [PTX618], the objection was sustained but Your Honor said that Dr. Shamos could discuss the exhibit."  (Tr. at 21:17-22:14).  And when Dr. Shamos reached the point in his direct testimony where demonstrative slide PDX3.67 was up on the screen in front of the jury, Defendants renewed their objection to displaying PTX618 on the slide, which Plaintiffs had not removed.  (Tr. at 273:17-275:23).  The Court addressed the objection, reiterating that PTX618 was not admissible but that Dr. Shamos could rely on and testify as to the contents of it if a foundation were lain before being shown to the jury.  (Tr. at 275:4-23).  Dr. Shamos then laid the foundation and the demonstrative was put back up and he continued his infringement opinion.  (Tr. at 276:1-278:12).  There was never any objection or ruling as to PTX619 or its display on slide PDX3.67 at any point during trial.  Although PTX619 was not an admitted exhibit, it is not the Court's job to make objections that counsel fail to recognize.  There is simply no basis for Defendants to now argue that the display of PDX3.67 was an error that requires undoing the verdict of infringement.

There are further reasons why the Court must reject Defendants' argument that the infringement verdict cannot stand if the now objected-to slides and evidence on those slides is not in the record.  Dr. Shamos's demonstrative slides were not themselves admitted into evidence and the jury was not given copies at any point during trial, including during deliberations.  Rather,

alongside various admitted evidence, the jury was assessing the weight and credibility of Dr. Shamos's expert ***testimony***. Moreover, expert testimony on an issue may be supported by facts that the expert has been made aware of or has personally observed – there is no requirement that an expert have documentary or testimonial evidence to support every aspect of their opinion. *See* FED. R. EVID. 703. And experts are allowed to rely on evidence not in the record. *See id.* ("If experts in the field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). A good example of this practice is when an expert demonstrates use of an accused product through pictures in explaining an ultimate opinion on infringement. For some of these objected-to slides, exactly that happened. (*See, e.g.*, D.I. 279, Appendix A at PDX3.44, PDX3.62 & PDX3.70). And finally, some of the now objected-to slides contained admissions by Defendants within the Federal Rules of Evidence and Civil Procedure that could have been read into the record by Dr. Shamos – *e.g.*, Defendants' 30(b)(6) testimony (Schanz) or Defendants' interrogatory responses (PTX341). The Court finds nothing improper in what the jury heard or considered in reaching their verdict.

Defendants' attempt to convert their failures to preserve objections at trial into court error that somehow warrants post-trial relief is not well-taken. Display of demonstrative slides PDX3.44, PDX3.45, PDX3.62, PDX3.64, PDX3.65, PDX3.66, PDX3.67, PDX3.69 and PDX3.70 during Dr. Shamos's direct examination provides no basis for overturning the jury verdict because Defendants repeatedly failed to object at trial and because the jury was ultimately evaluating expert opinion testimony, which can be based on evidence not in the record.

2.      "Context" as Used in the '502 and '386 Patents

Defendants next argue that "an unresolved claim construction issue" involving the term "context"[7] infected the verdict (D.I. 279 at 7-9) and, in doing so, again try to place the blame for their failures on the Court.  Neither side ever raised a dispute over the construction of "context." (*See* D.I. 60, Appendix A (original joint claim construction chart with no proposal to construe "context" apart from "Mach-context"); D.I. 96 (joint claim construction brief with no dispute over the meaning of or request to construe "context" apart from "Mach-context"); D.I. 104 (revised joint claim construction chart after court-ordered meet and confer with no proposal to construe "context" apart from "Mach-context"); D.I. 207 & 208 (letters requesting permission to file summary judgment with no mention of "context" requiring construction); D.I. 241 & 263 (final and amended final pretrial order with no reference to the construction of "context" as an issue remaining); *see also* D.I. 243 & 262 (proposed final jury instructions with no request for construction of "context")).  At trial, Dr. Shamos testified that "context" has meanings in the field of computing and in the field of operating systems, ultimately deciding to "interpret[]" the term in a way that was "consistent" with three definitions used in Apple documents and with "how the inventor understood 'context' as he was using it in the patent."  (Tr. at 228:1-229:3 & 226:7-227:1).  Defendants did not object to that testimony.

On cross-examination, Defendants attempted to elicit testimony from Dr. Shamos that the parties disputed the meaning of "context" as used in the '502 and '386 Patents.  The Court interrupted the questioning with a sidebar because of concerns that Defendants were conducting claim construction in front of the jury.  (Tr. at 334:3-340:8).  Thereafter, Defendants asked Dr. Shamos, "the patent specification uses the word context in at least two different ways . . . isn't

---

[7]      "Context" appears in all asserted claims across the two patents.

that true?"  Dr. Shamos replied yes and Defendants moved on.  (Tr. at 341:2-341:5).  The jury was ultimately instructed that all terms not explicitly construed were to be given their "ordinary meaning in the field of the patent" – an instruction that applied to "context."  (D.I. 267 at 5).

Defendants now argue that the Court "recognized the existence of an unresolved claim construction dispute . . . [yet] failed to resolve it or instruct the jury as to which of the six definitions" of "context" to apply.  (D.I. 279 at 8 (citing Tr. at 335:6-340:7)).  "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  As the Court pointed out during the sidebar during Defendants' cross-examination of Dr. Shamos, however, the parties had never before raised a dispute about the scope of this claim term.  (Tr. at 335:3-340:6).  Nevertheless, the Court asked Defendants to articulate the issue of claim construction so that the Court could decide whether it needed to be resolved before the case was submitted to the jury:

> MR. STEADMAN:  Your Honor, the next thing he's going to do is admit that the word context has multiple plain and ordinary meanings and he's just picked one and sort of applied to that.  We're entitled to show, I think if the Court is applying the plain and ordinary meaning that there is actually a different plain and ordinary meaning that's applicable in this case.
>
> THE COURT:  No, this is claim construction.  It's claim construction.  I'm sorry, you don't bring it up for the first time telling me that there is this issue when the witness is on the stand.
>
> MR. STEADMAN:  Okay.
>
> THE COURT:  If there is a claim construction issue you want me to address, you tell me and I will address it if it needs to be addressed and it's not an issue of fact.  But I haven't heard that there is one based on context, and you certainly aren't going to bring it up through the witness in the front of a jury if you have never told me that my construction is an issue.

MR. STEADMAN:  I don't believe your construction is an issue.  I think plain and ordinary meaning is the correct construction.

THE COURT:  Okay.  See, I don't do plain and ordinary meaning. [U]sually, I see [what] the plain and ordinary meaning is because I get these disputes usually in summary judgment where people say oh, the plain and ordinary meaning of extension cord is a brown cord that's exactly six feet long and someone else says no, it's something you use to plug into something to make the cord longer.  So if you guys had an issue where you have a dispute as to what the plain and ordinary meaning was, when did you bring that up to me?  When did you tell me that you guys don't agree on what the plain and ordinary meaning is?

MR. STEADMAN:  We didn't, Your Honor.

(Tr. at 335:11-336:19).  Defendants did not take the Court up on the admonition that "if there is a claim construction issue you want me to address . . . tell me."  Defendants also did not offer any construction or articulation as to the plain meaning of "context" as used in the '502 and '386 Patents.  Nor did they explain how a different meaning would alter the scope of the claims.[8] Ultimately, the Court told the parties that it considered any claim construction dispute over the term "context" – including over its plain meaning – waived.  (Tr. at 336:20-21).  The Court remains steadfast in that belief.

The Court recognizes that claim construction is a rolling process.  *See Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) ("[Courts] may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.  This is particularly true where issues involved are complex, either due to the nature of the technology or because the meaning of the claims is unclear from the intrinsic evidence." (citation omitted)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*,

---

[8]     That was true for Defendants' pre-verdict motion for judgment as a matter of law (D.I. 266 at 9) and it is true now.  There is no indication anywhere as to what Defendants believe the proper construction is or how that changes the scope of the claim in a way that is relevant to infringement.

750 F.3d 1304, 1310 (Fed. Cir. 2014) ("[P]arties in patent cases frequently stipulate to a construction or the court construes a term, only to have their dispute evolve to a point where they realize that a further construction is necessary."). Indeed, this Court has engaged in rolling claim construction on a number of occasions, including in this very case.[9] (D.I. 256). That being said, there comes a point when claim construction must stop – when a party waives the ability to ask for a dispute to be resolved because it has failed to raise the dispute in a timely way. In the Court's view, this case represents a good example. It is simply too late to raise a claim construction dispute (or the specter of one) in the middle of trial through cross-examination of a witness in front of a jury, particularly when the parties have never even hinted at a dispute over the scope of that term and the Court has already done supplemental claim construction once. No unresolved issue of claim construction for "context" was ever properly before the Court, and the Court did not fail to resolve any such dispute before the case went to the jury.[10] *See Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1369 (Fed. Cir. 2022) ("'There is not necessarily an *O2 Micro* issue, however, whenever further claim construction could resolve the parties' dispute' – rather, a party must 'sufficiently request further construction of the relevant limitation' to 'raise an actual dispute.'" (quoting *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1322 (Fed. Cir. 2016))).

Even if this issue were not waived, the Court is unpersuaded that there is any "fundamental dispute" over the ***scope*** of "context" that required resolution before the case was submitted to the

---

[9]     *See also Chemours Co. v. Daikin Indus., Ltd.*, No. 17-1612 (MN), 2022 WL 2753636 (D. Del. June 30, 2022); *Trimed, Inc. v. Arthrex, Inc.*, No. 18-666 (MN), 2021 WL 1174532 (D. Del. Mar. 29, 2021).

[10]    This is particularly true where, as here, the complaining party did not object to the jury instructions on this ground. *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003) ("When issues of claim construction have not been properly raised in connection with the jury instructions, it is improper for the district court to adopt a new or more detailed claim construction in connection with the JMOL motion.").

jury.  *See O2 Micro*, 521 F.3d at 1362.  A complained-of difference in meaning of the word "context" without any impact on claim scope is insufficient to create an *O2 Micro* problem that can undo the jury verdict.  Not only did Defendants fail to articulate any construction or plain meaning of "context," but they also failed to articulate any difference in claim scope arising from any differing constructions.  (*See* Tr. at 335:11-340:8 (during sidebar, Defendants never offering construction or articulation of different claim scope); Tr. at 766:18-767:2 (Defendants silent as to "context" during final jury instruction conference); D.I. 266 at 9 (Defendants' Rule 50(a) motion offering no construction for "context" or explanation of a different claim scope resulting therefrom)).  There was no dispute over claim scope – fundamental, actual or otherwise – that the Court had to resolve before the jury began deliberations.  Even now, Defendants fail to clearly articulate the dispute over claim scope and how it results in non-infringement if Defendants' secret construction is correct.  (*See* D.I. 279 at 9 ("If 'context' in the asserted claims is consistent with Apple's definitions of 'context' in PTX617 (*see* Tr. at 227:13-229:3) . . . then the accused iOS TeamViewer products cannot infringe the asserted claims because the undisputed evidence was that iOS does not meet these definitions.  Under the Apple definitions, there is no evidence that in iOS the agent client and agent server are two separate processes in separate Mach contexts.")).

Finally, as for the jury being presented with and "left free to consider" some six different constructions of "context" or engage in claim construction of that term (D.I. 279 at 8), the Court disagrees.  Dr. Shamos offered testimony about the nuanced usage of "context" within the field of computers, operating systems and Apple devices.  (Tr. at 226:7-228:22).  He then testified that all three of Apple's variations on "context" were consistent with his understanding of the plain meaning of the word in this case, which was "a set of resources available to a computer program." (*Id.* at 226:7-9 & 228:23-229:3).  Defendants' technical expert, Dr. Goldberg, testified that his

understanding of the plain meaning of "context" was "an environment that defines the resources that are available to a process." (*Id.* at 712:16-23). Dr. Goldberg never said that his understanding differed in any meaningful way from Dr. Shamos's, and neither expert offered any testimony that their opinion on infringement would change depending on how the plain meaning was articulated. And although Plaintiffs raise this precise point in their brief, Defendants remain silent as to the similarity between the two experts' articulation of the plain meaning. (*Compare* D.I. 291 at 9, *with* D.I. 292 at 9-8). Ignoring all this, Defendants appear to be arguing that Dr. Shamos alone somehow created a claim construction dispute that was improperly submitted to the jury. That did not happen. The Court ultimately agrees with Plaintiffs that the issue submitted to the jury was one of fact and one of infringement – *i.e.*, whether elements of the accused products are in the same "context" or different "contexts" under the plain meaning of the term. (D.I. 291 at 9).

Having rejected Defendants' evidentiary and claim-construction challenges to the jury verdict, the Court now turns to Defendants' arguments based on the sufficiency of the evidence.

3.   Infringement of the '502 and '386 Patents

As noted above, the jury found that Defendants' macOS and iOS software products directly infringe claims 25 and 27 of the '502 Patent and claims 25 and 27 of the '386 Patent and, further, that Defendants are liable for induced and contributory infringement for those claims. (*See* D.I. 269 at 2-4). Defendants move for judgment as a matter of law on each of these findings, arguing that the jury verdict is not supported by substantial evidence. (*See* D.I. 279 at 11-15). The Court addresses each theory of liability in turn.

a.   **Direct Infringement**

At trial, Plaintiffs asserted one method claim and one system claim from each of the '502 and '386 Patents against Defendants' macOS and iOS versions of TeamViewer software.

14

(*See* D.I. 241, Ex. 1 ¶¶ 8 & 9 (joint statement of uncontested facts listing the specific versions of accused software at issue)).  The jury found that Defendants directly infringed both claims of both patents.  (D.I. 269 at 2).  Instead of attacking the verdict by arguing that individual claim elements are absent from the accused products, Defendants' motion is largely focused on Plaintiffs' purported failure to offer substantial evidence that the accused software was actually used and used in the United States by Defendants.  (*See* D.I. 279 at 11-13).

Liability for direct infringement arises under 35 U.S.C. § 271(a) when a party, without authorization, "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent."  The activities set forth in § 271(a) do not result in direct infringement unless the accused product embodies the complete patented invention.  *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 & n.2 (Fed. Cir. 2000).  "Direct infringement by 'use' of a claimed system requires use of each and every element of the system."  *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1369 (Fed. Cir. 2021); *see also Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) ("[T]o 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it.").  "Direct infringement [of a method claim] occurs where all steps of a claimed method are performed by or attributable to a single entity."  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc).

Claim 27 of the '502 Patent and claim 27 of the '386 Patent are system claims, each of which requires various hardware components such as "one [computer] processor," "one [computer] memory," etc.  (*See* '502 Patent at Claim 27; '386 Patent at Claim 27).  It is undisputed that the accused macOS and iOS products are only software – that is, TeamViewer does not make,

sell or offer to sell the complete invention because it does not provide any of the claimed hardware. Therefore, any direct infringement by Defendants of the asserted system claims must be based on Defendants' own use within the meaning of § 271(a).  *See Synchronoss*, 987 F.3d at 1368 ("Because Dropbox does not provide its customers with any hardware in conjunction with its accused software, Dropbox does not make, sell, or offer for sale the complete invention.").  The same is true for the method claims – claim 25 of the '502 Patent and claim 25 of the '386 Patent. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use."); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003) ("The sale or manufacture of equipment to perform a claimed method is not direct infringement within the meaning of 35 U.S.C. § 271(a).").  And Dr. Shamos agreed that the only activity in this case giving rise to direct infringement of the method and system claims was Defendants' use in the United States.  (Tr. at 313:16-315:16 (allegations of direct infringement of system claims against TeamViewer based on use); *id.* at 319:4-8 (method claims)).  Against this backdrop,[11] the Court will address the jury's findings as to direct infringement based on each of the accused iOS and macOS software products.

Beginning first with iOS, the jury heard substantial evidence from which it could reasonably infer that Defendants used the accused iOS software in the United States, thereby committing direct infringement.[12]  Perhaps most importantly, as Defendants' own Chief of Staff and Strategy (Georg Beyschlag) testified, Defendants use the accused software for internal IT

---

[11]   Given the proper legal standards, the particular hardware required by the claims and the nature of the accused product (*i.e.*, software only), the Court finds it unnecessary to address Plaintiffs' conclusory capability arguments.

[12]   Again, apart from the "Mach-derived" limitation addressed below, Defendants do not argue that the accused macOS and iOS software does not directly infringe even when used.

support at the company.  (Tr. at 556:5-559:2).  That is, TeamViewer IT personnel remotely access other TeamViewer employees' devices in the United States using the accused software.  (*Id.* at 556:21-557:16).  Mr. Beyschlag also testified that some of those employees use iPhones.  (*Id.* at 557:21-559:2).  In fact, TeamViewer employees of a certain seniority level in the United States are provided iPhones and Mr. Beyschlag said that he believed that the accused software was pre-installed in those instances.  (*Id.* at 558:18-559:2).  Despite acknowledging that TeamViewer employees use iPhones in the United States, Defendants seem to suggest that Plaintiffs were required to offer evidence of specific instances of use.  (*See* D.I. 279 at 12 ("While it is possible that some TeamViewer employees may use iPhones in the United States, there was no evidence of any employee ever having done so.")).  Requiring such proof would be tantamount to requiring direct evidence to prove a fact.  That is clearly wrong.  "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Metabolite Lab'ys, Inc. v. Lab'y Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004) (cleaned up).  The jury was presented with evidence that some TeamViewer employees had iPhones (including some with the accused software pre-installed) and that TeamViewer IT used the accused software to remotely troubleshoot employee issues in the United States.  Using this circumstantial evidence, the jury could reasonably infer that Defendants used the accused iOS software in the United States in at least one act of direct infringement of the asserted system and method claims.  The Court will not disturb that finding.

Turning next to the accused macOS software, the Court reaches a different result.  There is simply no evidence in the record that Defendants themselves used the accused macOS software in any act of direct infringement.  Plaintiffs contend that a marketing video "demonstrated infringing uses of both the MacOS and iOS products" (D.I. 291 at 13), but the Court sees no

reference to any macOS software or device in that video anywhere (*see* PTX650).  Regardless of where produced, that video only depicts an iPhone user being remotely assisted with TeamViewer software.  (PTX650).  The video has nothing to do with macOS software or macOS-running devices.  As for the four trade shows that Dr. Shamos identified, Mr. Beyschlag testified that no demonstrations of the accused software occurred at the first two because those shows were concerned with augmented reality products and, further, that he believed no accused product demonstrations occurred at the other two because "that's just frankly too boring to demonstrate." (Tr. at 538:6-540:23).  Although he admitted on cross-examination that "TeamViewer has demonstrated its core product to customers in the U.S." (*id.* at 560:6-8), there is no indication as to whether any such demonstration (at trade show or otherwise) was for the accused macOS software.[13]  And despite TeamViewer using its own accused software for internal IT support, the inferences to be drawn from this as to the accused macOS products differ from the iOS products. Mr. Beyschlag explained that they only supply employees with IBM notebooks and that employees cannot "bring their own private devices [as] it would be contradictory to [TeamViewer's] highest standard of security."  (*Id.* at 557:25-558:17).  There was no evidence of any TeamViewer use of any computer running macOS.  In the Court's view, there is insufficient evidence to support a finding that Defendants used the accused macOS software in the United States so as to directly infringe the asserted system and method claims.  Judgment as a matter of law will be granted in Defendants' favor on direct infringement based on the macOS software.

Finally, Defendants also argue that the verdict of direct infringement cannot stand because there was no evidence that the accused products satisfy the "Mach-derived" limitation – *i.e.*, whether the accused products are "derived from an operating system kernel developed at Carnegie

---

[13]    Mr. Beyschlag testified that TeamViewer only began attending trade shows in 2018. (Tr. At 559:23-560:5).

Mellon University (CMU) from 1985 to 1994." (D.I. 279 at 14-15). In Defendants' view, it was necessary to specifically link the operating system kernel used in the accused macOS and iOS products to that CMU kernel and, further, that the only way to do so would be a source code review of the Apple kernels and a comparison to show the evolution of the Mach kernel from the CMU version all the way to present day. (*Id.* at 15). The Court disagrees.

Plaintiffs presented the jury with evidence from Apple's Kernel Programming Guide, which said that "fundamental services and primitives of the OS X kernel are based on Mach 3.0. Apple has modified and extended Mach to better meet OS X functional and performance goals." (PTX508 (Mach overview from Apple); *see also* Tr. at 218:20-220:13 (Dr. Shamos testifying as to Apple's Mach overview)). Dr. Shamos explained that this paragraph indicates that the Apple operating system OS X is "Mach-derived." (Tr. at 219:21-220:2; *see also id.* at 219:24 ("OS X is Mach-derived.")). Dr. Shamos also explained that "OS X is the predecessor of Mac OS" and, further, that Mac OS X is largely a "rebrand" of OS X with both being "fundamentally the same operating system." (*Id.* at 219:14-220:2). As for accused software for iOS devices, Dr. Shamos testified that iOS is "a scaled down version of Mac OS for the smaller devices like the iPad and iPhone" and is also "Mach-derived" as evidenced by his review of more than twenty timelines showing the "family tree history of Mac OS and iOS." (*Id.* at 220:12-221:5). And he presented a well-known treatise in the field to the jury that similarly concludes that both Mac OS and iOS operating systems are derived from the Mach kernel, specifically referencing CMU in the mid-1980s. (*Id.* at 222:1-223:14). Although Defendants' expert may have offered a competing opinion, he also testified that at least some versions of macOS were "Mach-derived." (*Id.* at 693:16-694:23). Presented with this evidence,[14] the jury was free to make credibility

---

[14]     Plaintiffs raise much of this evidence in their answering brief (D.I. 291 at 15-16) and, once again, Defendants remain silent in reply (D.I. 292).

determinations and weigh the evidence to reach the conclusion that the accused macOS and iOS products were "Mach-derived."  The Court will not disturb the finding of direct infringement on that basis.

#### b.  <u>Indirect Infringement</u>

Plaintiffs also asserted that Defendants induced and contributed to infringement of the asserted claims of the '502 and '386 Patents.  Induced infringement under § 271(b) requires that "the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent."  *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).  Contributory infringement under § 271(c) occurs where an alleged infringer sells, offers to sell or imports into the United States a component of a patented invention knowing that component is especially made or adapted for use in infringing the patent at issue.  Contributory infringement requires proof that the component has no substantial non-infringing uses and is a material part of the patented invention.  *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).  To give rise to either inducement or contributory liability, the accused infringer must know that the induced acts constitute infringement of another's patent.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).  And for both inducement and contributory infringement, there must be an underlying act of direct infringement as a prerequisite to indirect liability.  *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) ("There can be no inducement or contributory infringement without an underlying act of direct infringement.").  The jury found that Defendants were liable for both forms of indirect infringement.  (D.I. 269 at 3-4).

Defendants now complain that the verdict cannot stand because (1) no underlying act of direct infringement was identified let alone proven, (2) there was no evidence to support a finding

that Defendants had the requisite pre-suit knowledge of the '502 and '386 Patents and (3) there was no evidence to support a finding that Defendants encouraged infringement of the patents. (D.I. 279 at 13-14). There is no mention of contributory infringement in Defendants' papers nor is there a challenge to any element unique to the contributory infringement (*e.g.*, substantial non-infringing uses). Therefore, the Court views any challenge by Defendants to the verdict of contributory infringement to be limited to elements shared with inducement – *i.e.*, whether there was proof of an underlying act of direct infringement and proof of knowledge of the '502 and '386 Patents.

Defendants first argue that there is no evidence of the requisite underlying act of direct infringement because Plaintiffs did not identify "one direct infringer allegedly induced by TeamViewer." (D.I. 279 at 13). As Plaintiffs correctly note, it is unnecessary to identify a specific direct infringer induced by Defendants. To require such specificity would mean that circumstantial evidence could never be used to support a finding of direct infringement – again, a proposition that is obviously wrong. *See Metabolite Lab'ys*, 370 F.3d at 1365. The jury was presented with evidence that many customers downloaded and installed the accused software on macOS and iOS devices in the United States. (D.I. 291 at 13-14).[15] In particular, the jury had a TeamViewer spreadsheet with "a data dump from [TeamViewer's] data management system that shows . . . operation and usage data of [TeamViewer] software." (Tr. at 531:11-17; *see also* PTX332). Mr. Beyschlag testified that this spreadsheet showed many downloads of the accused software and, in particular, onto macOS and iOS devices in the United States. (Tr. at 531:18-532:23; PTX-332 at Columns A (country_code listing US in many instances) & B (initial_os_type listing OSX and IOS)). And Mr. Beyschlag testified that customer use of the accused software after download is "very important for [TeamViewer] to create user trust with the download." (Tr. at 545:20-24).

---

[15]     Defendants offer no response to this evidence. (*See generally* D.I. 292).

The Court finds that the jury could reasonably infer based on this circumstantial evidence that at least one of TeamViewer's hundreds of thousands of customers used the accused macOS and iOS software in the United States engaged in an underlying act of direct infringement.

Defendants next argue that there was not substantial evidence supporting a finding of pre-suit knowledge of the '502 and '386 Patents and, as such, the verdict as to pre-suit induced and contributory infringement must be overturned.  (D.I. 279 at 13-14).  Aqua Connect's CEO, Ronnie Exley, testified that he listed the '093 Patent – the patent to which the asserted patents claim priority – on Aqua Connect's website in October 2013 around the time that that patent issued.  (Tr. at 139:24-140:12; *see also* PTX455 (July 17, 2019 screenshot of Aqua Connect licensing website that says "[t]his product is protected by one or more Patents, including U.S. Patent No. 8,549,093")).  He also testified that, in December 2013, the '093 Patent was listed on the install screen of an Aqua Connect product that is downloaded and run on a Mac machine.  (Tr. at 140:13-22; *see also* PTX397 (an installer screen for Aqua Connect Remote Desktop Services Version 3.7.4911 that provides "[t]his product is protected by one or more Patents, including U.S. Patent #8,549,093")).  Then, in May 2017, Mr. Exley listed the '502 and '386 Patents on pricing request forms available on Aqua Connect's website, as well as on another installation and product update screen.[16]  (Tr. at 140:24-142:8; *see also* PTX396 (an installer screen for Ignision SE that provides "[t]his product is protected by one or more U.S. Patents, including U.S. Patent No. 8,924,502 and RE46,386") & PTX628 (fillable form printed on July 18, 2022 that allows someone to request pricing information from Aqua Connect and includes the language "[t]his product is protected by one or more U.S. Patents, including U.S. Patent No. 8,924,502 and RE46,386")).  Finally, Mr. Exley testified that, in 2014, TeamViewer GmbH requested a trial and obtained a license of

---

[16]     This was some three-and-a-half years after the '502 Patent issued.

Aqua Connect software but declined to renew in 2016.  (Tr. at 142:21-148:10; *see also* PTX375).

There is no evidence TeamViewer continued to use the product beyond 2016.

Although the jury had evidence to find that Defendants had pre-suit knowledge of the '093

Patent (through the 2014-2015 software license), the question is whether the jury had substantial

evidence to find that Defendants had pre-suit knowledge of the '502 and '386 Patents.  Plaintiffs

argue that the installation screen marked with the '093 Patent in 2014-2015 is sufficient to provide

Defendants with knowledge of the later but related '502 and '386 Patents, relying on *SynQor, Inc.*

*v. Artesyn Technologies, Inc.*, 709 F.3d 1365 (Fed. Cir. 2013).  The Court is unpersuaded.  As an

initial matter, *SynQor* involved very different facts.  There, the evidence at trial showed that the

patentee marked its bus converters and datasheets with its patents in an industry that was

"extremely competitive" – so much so that it was common for the defendants to review each

other's products and datasheets.  *See SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-497-TJW-CE,

2011 WL 3624957, at *3 (E.D. Tex. Aug. 17, 2011).  Moreover, the jury heard evidence that "there

was a significant effort" by the defendants to imitate the patentee's products (which were marked)

and, further, that the competitors in the industry would and did obtain each other's products

(including patentee's marked products) and reverse-engineer them.  *Id.*  There was even further

evidence – *e.g.*, an employee downloading a copy of one of the patents, employee admitting to

obtaining physical samples of marked product, employee emailing marked datasheet, etc.  *See id.*

at *3-10.  Plaintiffs here did not come anywhere near the level of evidence provided in *SynQor*.

There was no evidence that Defendants engaged in any competitive monitoring or that such

activity was common in the industry.  Indeed, all that the jury heard was that Defendants may have

had knowledge of the '093 Patent in the 2014-2015 timeframe and then, sometime later in 2017,

Plaintiffs began marking their website and another product's install screen with the '502 and '386

Patents.  Without more, knowledge of the '093 Patent is not sufficient to prove the requisite pre-suit knowledge of the '502 and '386 Patents.  There simply was not substantial evidence to support a finding of pre-suit knowledge of the '502 and '386 Patents, and the verdict as to liability for induced and contributory infringement must be limited to October 2018 and later.

Finally, although the Court will grant judgment as a matter of law as to pre-suit induced and contributory infringement, the Court must still address Defendants' remaining complaint as to indirect infringement.  Defendants argue that there was no evidence at trial to suggest that they encourage others to infringe the '502 and '386 Patents, which is required for a finding of inducement liability.  On this point, neither side provides anything helpful – in fact, the briefing is so lacking that it borders on comical.  Defendants simply say there was no evidence from Mr. Exley and Dr. Shamos agreed he could not testify on intent.  (D.I. 279 at 14).  Plaintiffs wave their hands and explain that customer instruction "satisfies the knowledge element of inducement." (D.I. 291 at 14-15).  First of all, Defendants are attacking the separate intent element of inducement here – not knowledge of infringement.  *See Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002) ("In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." (citation omitted)). That is, Defendants are attempting to argue that Plaintiffs have failed to prove intent to encourage the infringing acts.  *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018) ("[S]pecific intent and action to induce infringement must be proven." (cleaned up)).  Plaintiffs do not appear to appreciate that distinction.

Apart from that failure, Plaintiffs' response is deficient on another level.  Citing nothing, Plaintiffs assert that TeamViewer "instruct[s] customers on how to use a product in an infringing

manner, which Beyschlag and Schanz confirmed." (D.I. 291 at 15). The Court is truly dumbfounded at Plaintiffs' failure to cite any portion of the trial record – even the testimony of these witnesses they call out – to support this assertion (or inducement element). Nevertheless, given the TeamViewer customer instructions and guides in the record, the Court finds that the jury could reasonably find that Defendants encouraged its customers to perform the acts that constitute infringement. (*See* PTX469 ("How to Use TeamViewer" on TeamViewer's website to assist customers); PTX472 (instruction manual on how to use accused software); *see also* Tr. at 295:13-299:3 (Dr. Shamos's testimony on induced infringement)). Specific intent can be proven through circumstantial evidence and it can reasonably be inferred from Defendants' actions here. *See OKLucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009) ("A plaintiff may still prove the intent element through circumstantial evidence, just as with direct infringement . . . . Evidence of active steps taken to induce infringement, such as advertising an infringing use, can support a finding of an intention for the product to be used in an infringing manner.").

Because substantial evidence supports the jury's findings, the Court will deny Defendants' motion as it relates to iOS direct infringement and post-suit indirect infringement. As to pre-suit induced and contributory infringement, as well as Defendants' direct infringement based on the accused macOS software, the Court finds that there is not substantial evidence to support the verdict and will grant Defendants' motion. The jury verdict will be partially vacated accordingly.

### 4.   Invalidity of the '502 and '386 Patents

Defendants asserted that the asserted claims were invalid as anticipated over U.S. Patent No. 8,166,518 ("Price-Epard") or, in the alternative, obvious over Price-Epard in combination with the knowledge and skill of a person of ordinary skill in the art. The jury found that the asserted claims were not invalid as anticipated or obvious. (*See* D.I. 269 at 5). Dedicating just four

paragraphs to the issue in their post-trial brief, Defendants purport to renew their motion for judgment as a matter of law that claims 25 and 27 of the '502 Patent and claims 25 and 27 of the '386 Patent are invalid as anticipated and as obvious.  (*See* D.I. 279 at 15-17).  It is unclear, however, that Defendants actually moved for judgment as a matter of law under Rule 50(a) on any issue of invalidity.  In any event, substantial evidence supports a finding that Defendants failed to meet their clear and convincing burden on both theories of invalidity.

"A patent is invalid for anticipation under 35 U.S.C. § 102 if a single prior art reference discloses each and every limitation of the claimed invention."  *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1351 (Fed. Cir. 2016).  "Anticipation is a factual question, and a jury verdict regarding anticipation is reviewed after trial for substantial evidence."  *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1343 (Fed. Cir. 2003).  Here, substantial evidence supports the jury's finding that Price-Epard did not disclose each and every element of the asserted claims.  The jury heard evidence from Defendants' own expert that Price-Epard did not explicitly (or inherently) disclose the "Mach-derived" elements required by the claims.  (*See* Tr. at 696:10-697:21 & 699:23-700:3; *see also id.* at 698:4-12 (Dr. Goldberg admitting he was not relying on inherent disclosure for any claim element)).  Dr. Goldberg's theory was instead that Price-Epard's disclosure of a Unix-based host computer was disclosure of a "Mach-derived" system or computing device because, as he repeatedly asserted, disclosure of Unix was effectively disclosure of "Mach-derived."  (*See, e.g.*, Tr. at 696:20 ("Unix is a family of operating systems"); *id.* at 697:20-21 ("disclosure of Unix is a disclosure of all Unix[es], including Mach-derived Unix[es]"); *id.* at 698:7-8 ("I'm saying Unix, disclosing Unix discloses Mach-derived versions of Unix")).  The jury was free to consider this testimony and credit it (or not) as appropriate, particularly because not all Unix-based systems were derived from the CMU operating system kernel.  (*See*

D.I. 267 at 5 (final jury instructions providing claim construction of "Mach-derived" as "derived from an operating system kernel developed at Carnegie Mellon University (CMU) from 1985 to 1994 but does not include Windows- or DOS-based systems, nor does it include Unix-based systems that are not derived from this kernel")).[17]  This is especially true in light of the testimony offered by Dr. Shamos that there were a large number of Unix-based operating systems not based on the Mach kernel and, further, that Price-Epard disclosed a specific trade name version of Unix (owned by Dell), which was not "Mach-derived."  (Tr. at 870:2-11; *see also id.* at 870:12-871:4).

Additionally, the jury also heard evidence that Price-Epard did not disclose the "agent server" generating "data corresponding to the update to the user instance" elements from all four claims.  Responding to Dr. Goldberg's opinion that the "master process" and "slave process"[18] of Price-Epard satisfy this element of the asserted claims (Tr. at 615:20-617:4), Dr. Shamos testified that Price-Epard did not disclose an agent server "generating data corresponding to a user update" but instead disclosed user-switch notifications flowing from the slave process to the master process and that, in his opinion, a simple user switch did not constitute data corresponding to a user update (*id.* at 876:9-878:22).  Dr. Shamos also explained that, because the master process of Price-Epard provides access to the computer's display, it could not constitute disclosure of the "agent client" recited in the asserted claims because that "agent client" has no access to the display.  (*Id.* at 879:1-24).  The jury heard the evidence and competing expert testimony and was free to decide which expert was more credible.  The Court will not reweigh the evidence or disturb the jury's finding.

---

[17]     Indeed, the supplemental claim construction clarification over "Mach-derived" arose in part out of the apparent agreement that some Unix-based systems at the time of invention were not derived from the Mach kernel developed at CMU.  (*See* D.I. 256 at 3-4 (revised claim construction of "Mach-derived" based on evolving understanding of technology and apparent agreement among the parties' experts)).

[18]     (*See* Tr. at 617:5-8 (explaining this terminology in computer science goes back at least 70 years)).

Turning now to obviousness, Defendants maintain that, if not anticipated, the asserted claims of the '502 and '386 Patents are obvious in light of Price-Epard. Although obviousness is ultimately a question of law, it is based on underlying factual findings. *See Game & Tech. Co. v. Activision Blizzard Inc.*, 926 F.3d 1370, 1379 (Fed. Cir. 2019). "What a reference teaches and whether a person of ordinary skill in the art would have been motivated to combine the teachings of separate references are questions of fact." *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1353 (Fed. Cir. 2012). Substantial evidence supports the jury's finding that Defendants failed to prove by clear and convincing evidence that the Price-Epard patent renders the asserted claims obvious. The jury was free to reject Dr. Goldberg's sparse testimony that it would have been obvious for a person of ordinary skill in the art to modify Price-Epard by implementing its disclosed Unix system on a Mach-derived operating machine (Tr. at 631:6-632:21 & 655:13-656:6), particularly because that testimony is unaccompanied by any evidence of why or how a person of ordinary skill would have done so – or what would have resulted. As Dr. Shamos noted, Dr. Goldberg never articulated any motivation for a person of ordinary skill to modify the Price-Epard Unix system to run on a Mach-derived system. (*Id.* at 881:21-882:9). And Dr. Shamos also pointed out that Dr. Goldberg did not explain any steps necessary to put the Price-Epard Unix system onto a Mach-derived system or how the system would need to be modified (and how it might suffer) if done. (*Id.* at 881:11-20). In light of the competing testimony and Defendants' barebones proffer, the Court sees no basis to disturb the jury's obviousness findings.

From all of this, the jury reasonably could have found that Defendants failed to meet their burden to prove invalidity due to anticipation or obviousness by clear and convincing evidence. Moreover, Defendants have not satisfied the standard for judgment as a matter of law that applies to an issue (like this one) on which they bear the burden of proof – that is, Defendants have not

demonstrated that there is "insufficient evidence for permitting any different finding." *Fireman's Fund*, 540 F.2d at 1177.  The verdict of no invalidity will remain undisturbed.

### 5.  Indefiniteness Based on the "Mach-derived" Terms

Defendants opted not to pursue indefiniteness at trial, representing to the Court that "under the Court's supplemental construction [of the 'Mach' terms], [they] would no longer have an indefiniteness argument."  (Tr. at 26:7-8).  In their post-trial motion, Defendants include a single paragraph on indefiniteness, arguing that the Court's revised construction of "Mach-derived" is indefinite (as apparently was the Court's previous construction as well).  (D.I. 279 at 17).  Defendants argue that a person of ordinary skill in the art would not be able to determine with reasonable certainty whether any given operating system kernel would fall within the meaning of "Mach-derived" as construed.  Yet Defendants do not present any evidence to support this claim.  In fact, Defendants fail to offer even attorney argument or case law to support their assertion that the claims should fall under § 112 because of the revised construction of "Mach-derived."  Invalidity must be proven by clear and convincing evidence and, to the extent Defendants' post-trial mention attempts to invalidate the claims as indefinite, it fails to meet this (or any) evidentiary burden as no evidence was presented.

### 6.  Broadening Reissue of the '386 Patent

Defendants argue that the '386 Patent claims are invalid as an improper broadening reissue.  Section 251 of the Patent Act provides that "[n]o reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."  35 U.S.C. § 251.  The '386 Patent is a reissue of U.S. Patent No. 8,549,093 ("the '093 Patent").  The '093 Patent issued on October 1, 2013 and the application for reissue was filed on February 27, 2014.  Although the reissued patent (the '386 Patent) was applied for within two

years of the original patent (the '093 Patent), Defendants argue that the application seeking reissue never made explicit the intent to broaden claims within that two-year deadline as is required. (D.I. 279 at 9-10).  But, according to Defendants, the applicant ultimately sought claims that broadened the scope of the original patent on August 4, 2016 – ten months after the two-year window closed – purportedly resulting in an invalid broadening reissue.  (D.I. 279 at 9-10). Plaintiffs respond that these amendments to claims 25 and 27 – the addition of "a shared computer memory" – did not broaden the scope of the original '093 Patent because "shared memory" was already recited in the claims and the amendments only made the claims "internally consistent." (D.I. 291 at 10-11).

In determining whether a patent is an improper broadening reissue in violation of § 251, courts must undertake a claim-by-claim analysis.  *ArcelorMittal France v. AK Steel Corp.*, 786 F.3d 885, 890 (Fed. Cir. 2015).  Fundamentally, this is an issue of claim construction.  *Id.* at 888 ("Whether amendments made during reissue enlarge the scope of the claim, and therefore violate § 251, is a matter of claim construction . . . .").  Defendants insist that no claim construction is necessary to resolve the question of whether the '386 Patent is invalid as an improper broadening reissue.  (D.I. 292 at 9).  The Court disagrees.  It is wholly unclear how the Court could possibly determine whether the reissue claims are broader than the original claims without understanding the scope of both sets of claims and then comparing the two.  And ascertaining the scope of claims is a matter of claim construction.  *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) ("The claim language defines the bounds of claim scope."); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("Claim interpretation is the process of giving proper meaning to the claim language.  Claim language, after all, defines claim scope."), *opinion amended on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997).  The Court thus finds that claim construction

is necessary to address Defendants' broadening reissue defense, particularly because the parties dispute whether addition of "shared compared memory" enlarged the scope of the reissue claims over their original scope.  The Court is not convinced, however, that Defendants have preserved – or even adequately presented – this issue of claim construction.

Defendants never raised broadening reissue or any claim construction issue relevant to that inquiry during claim construction proceedings.  (*See* D.I. 60, Appendix A (original joint claim construction chart with no proposal to construe "shared computer memory" or anything related to broadening reissue); D.I. 96 (joint claim construction brief with no dispute over broadening reissue or term relevant thereto); D.I. 104, Appendix A (revised joint claim construction chart with "Mach-derived" / "Mach context" / "Mach contexts" as sole remaining disputed terms)).  The first time that broadening reissue of the '386 Patent was raised with the Court was in connection with letters requesting permission to file summary judgment.  (*Compare* D.I. 207 (Plaintiffs' letter), *with* D.I. 218 (Defendants' letter)).  In denying leave for summary judgment, the Court indicated that it would "address the issues raised regarding the broadening reissue during trial after the jury has left for the day and/or in post trial submissions as appropriate."  (D.I. 226).

At the final pretrial conference,[19] the Court emphasized its understanding that this issue was a matter of claim construction and pressed Defendants on why they had not raised it accordingly.  (D.I. 246 at 55:22-60:13).  The Court referenced Federal Circuit law that held "[whether] amendments made during reissue enlarge the scope of the claim and therefore violate Section 251[] is a matter of claim construction" and indicated that the issue is "something that should have been done a long time ago."  (*Id.* at 59:3-19 (referencing *ArcelorMittal*, 786 F.3d at

---

[19]    In the proposed pretrial order, Defendants listed the broadening reissue question in their statement of issues of fact and of law that remain to be litigated in the proposed pretrial order.  (D.I. 241, Ex. 3 ¶ 12 & Ex. 5 ¶ 21).  Yet the parties agreed in the cover pleading that this defense only raised "issues of law for the Court" to decide.  (D.I. 241 ¶ 100).

890)).   Defendants offered no explanation for omitting the issue during claim construction proceedings.   The Court explained that, to the extent the issue would be heard at all, it would be during trial but in a separate proceeding after the jury leaves for the evening.   (D.I. 246 at 59:8-13; *see also* D.I. 255 at 1 n.2).   On the first day of trial, Defendants indicated that they wanted to present the broadening reissue defense through post-trial briefing only.   (Tr. at 27:18-28:1).   And Defendants dedicated just five short paragraphs to this argument in their post-trial brief.   (D.I. 279 at 9-11).

In light of the foregoing, the Court is not convinced that Defendants should be permitted to pursue their broadening reissue invalidity defense now in the form that Defendants chose. Contrary to Defendants' argument (D.I. 292 at 9), the Court's acceptance of post-trial briefing on the issue does not foreclose the Court's ability to find that Defendants have waived the ability to pursue invalidity under § 251.   Barebones post-trial briefing on an issue never before heard does not allow the Court to properly resolve a dispute that may be presented on appeal as one of the more important issues in this case.   The record is insufficient, and the Court needs more before reaching broadening reissue on the merits, particularly because the Court rejects Defendants' footnote request to admit DTX604 – the reissue '386 Patent file history – "into evidence for the bench portion of the trial only."   (D.I. 279 at 10 n.3).   Despite being offered bench proceedings so that evidence could be presented, Defendants opted to pursue the issue only through post-trial briefing, foreclosing the opportunity to move exhibits into evidence.[20]   Apart from deficiencies in

---

[20]     As for Defendants' request for the Court to take judicial notice of the entire prosecution history at DTX604, the Court may take notice of the existence of it and that prosecution happened – but not the facts contained within that are subject to reasonable dispute.   *See, e.g.*, *Doe v. Princeton Univ.*, 30 F.4th 335, 342-43 (3d Cir. 2022); *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 273 n.11 (3d Cir. 2007) (taking judicial notice of FDA announcement published in the Federal Register "not for the truth of its contents, but rather as evidence of the information provided [relevant to the underlying dispute"); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,

the record, Defendants' post-trial presentation is also unhelpful as lacking any meaningful discussion of the claim construction issue flagged by Plaintiffs.  The Court therefore declines to address the defense on the merits as presented.

The Court's decision is bolstered by the fact that this case does not end with this Opinion. There will almost certainly be further trial proceedings or, at the very least, further submissions. Therefore, to the extent Defendants still wish to pursue broadening reissue, Defendants must first show good cause as to why they should be allowed to do so.

### 7.   Damages

The jury awarded Plaintiffs $5,700,000 in damages in the form a lump-sum royalty payment.  (D.I. 269 at 6).  The Court cannot discern whether the jury award would remain the same if any of the jury's various infringement findings change.  That is, it is wholly unclear whether $5,700,000 in damages is appropriate without direct infringement based on macOS and without pre-suit indirect infringement, particularly because vacating the latter cuts off about four years of damages.  Therefore, the proper path forward is to vacate the award and order a new trial on damages.  *Cf. Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007) ("[W]here the jury rendered a single verdict on damages, without breaking down the damages attributable to each patent, the normal rule would require a new trial as to damages.").

### 8.   New Trial

In connection with Defendants' request for judgment as a matter of law on infringement and invalidity for anticipation and obviousness, Defendants request a new trial in the alternative.

---

181 F.3d 410, 426 (3d Cir. 1999) ("[W]e may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.").  Those facts subject to reasonable dispute include facts relevant to the broadening reissue arguments.

(*See* D.I. 279 at 15 & 17).  Defendants never articulate the reasons for why a new trial should be ordered but the Court assumes the request for a new trial is based on the argument that the jury's verdict was against the weight of the evidence.[21]  The Court has already found that substantial evidence supports the jury verdict on invalidity, direct infringement based on the accused iOS software and post-suit indirect infringement.  (*See supra* §§ II.A.3.a & b).  For the same reasons, the Court concludes that the jury's verdict was not against the weight of the evidence, even without viewing the evidence most favorably to Plaintiffs.  That is, Defendants have failed to show that "a miscarriage of justice would result if the verdict were to stand," that the verdict "cries out to be overturned" or that the verdict "shocks [the] conscience."  *Williamson*, 926 F.2d at 1352-53.  Therefore, Defendants' motion for a new trial is denied.

That being said, the Court is granting Defendants' request for judgment as a matter of law as to pre-suit indirect infringement and as to direct infringement based on the accused macOS software.  (*See supra* §§ II.A.3.a & b).  Federal Rule of Civil Procedure 50(c)(1) provides that, "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed."  FED. R. CIV. P. 50(c)(1).  Should the Federal Circuit later reverse or vacate the judgment of non-infringement as to pre-suit induced infringement or direct infringement based on the macOS software, this Court believes that no new trial is warranted.  Again, Defendants articulate no specific ground(s) entitling them to new trial, and the Court

---

[21]   This assumption seems reasonable given that the alternative request for a new trial comes immediately after the related request to overturn the jury verdict based on insufficient evidence.  (*See, e.g.*, D.I. 279 at 15 ("TeamViewer is thus entitled to JMOL of no infringement or, in the alternative, a new trial should be granted."); *see also id.* at 17 ("No reasonable juror could find the asserted claims were not obvious in view of Price-Epard.  Accordingly, TeamViewer is entitled to JMOL on invalidity or, in the alternative, should be granted a new trial.")).

construes their request to be based on the argument that the verdict was against the weight of the evidence.  Given that the Court has granted judgment as a matter of law on the basis that the jury verdict was not supported by substantial evidence, if the Federal Circuit disagrees, that presumably means that the jury's findings were adequately supported.  There would be no basis to grant a new trial request on the same grounds that the Federal Circuit rejected.  This is especially true given that the standard for granting a new trial based on evidentiary deficiencies is even more demanding than for judgment as a matter of law.  *See Williamson*, 926 F.2d at 1352-53 (the verdict must "shock the conscience" or "cry out" to be overturned).  Thus, the Court conditionally denies any request for a new trial on direct or pre-suit indirect infringement.

### B.    Plaintiffs' Request for Pre- and Post-Judgment Interest

Plaintiffs have moved to alter or amend the judgment under Federal Rule of Civil Procedure 59(e) to include pre- and post-judgment interest on the award.  (*See* D.I. 276 & 277).  The jury award of $5,700,000 will be vacated in light of the Court's grant of judgment as a matter of law on pre-suit inducement and certain direct infringement and, as such, a new trial on damages appears necessary.  It is therefore premature at this time to address Plaintiffs' request for pre- and post-judgment interest, particularly in light of the fact that a new judgment will be necessary and the amounts of damages and accompanying interest will likely change.  Plaintiffs' motion for pre- and post-judgment interest will be denied with leave to renew after any subsequent judgment following any new damages trial.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' renewed motion for judgment as a matter of law or, in the alternative, a new trial (D.I. 278) is GRANTED-IN-PART and DENIED-IN-PART and

Plaintiffs' motion for pre- and post-judgment interest (D.I. 276) is DENIED without prejudice to renew.  An appropriate order will follow.